In the UNITED STATES DISTRICT COURT
for the WESTERN DISTRICT OF TEXAS
– AUSTIN DIVISION –

| | | |
|---|---|---|
| JOHN STEPHEN THORNE | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| vs. | § | **Civil Action No. 1:15-CV-00561** |
| | § | |
| UNION PACIFIC CORPORATION | § | |
| | § | |
| *Defendant* | § | |

# PLAINTIFF'S ORIGINAL COMPLAINT

John Stephen Thorne, as Plaintiff, brings this declaratory judgment action to establish and valuate Plaintiff's stock ownership in Union Pacific Corporation ("UPC"), Defendant, and upon information and belief states as follows:

## Summary

1.      This is a civil action for an accounting and  declaratory judgment establishing:  (a) the number, class, and present dollar value of shares of stock that Plaintiff owns in UPC, by virtue of his ownership of 300 shares of stock issued in 1859 in the Southern Pacific Railroad Company, a Texas railroad corporation that in 1872 was merged into the Texas & Pacific Railway Company, which in 1976 was merged into the Missouri Pacific Railroad Company, which in 1997 was merged into the Union Pacific Railroad Company, which UPC wholly owns; and (b) the cumulative dollar amounts of the dividends and interest earned on Plaintiff's shares, from the date of their issuance to the present, and owed in cash, to the extent those sums are not reinvested in and included in the valuation of his UPC shares.

2.      Plaintiff further seeks an injunction or specific-performance order requiring UPC to register Plaintiff's shares of UPC stock in his name with the proper authorities and exchange,

and to pay Plaintiff the cash amount of dividends and interest accumulated, if owed in cash.

     3.    Plaintiff also seeks recovery of interest and costs as appropriate and allowed by law.

## Parties & Service of Process

     4.    Plaintiff John Stephen Thorne lives in Austin, Texas.

     5.    Union Pacific Corporation is a Utah corporation with headquarters in Nebraska, and may be served with process upon its registered agent:  CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

## Jurisdiction

     6.    Plaintiff is a citizen of Texas, and UPC is deemed a citizen of both Utah and Nebraska, so the parties are diverse.  The matter in controversy vastly exceeds the sum or value of $75,000, exclusive of interest and costs, in that the UPC stock in which Plaintiff claims ownership is likely worth hundreds of millions of dollars.  Therefore, under title 28 U.S.C. section 1332, this Court has jurisdiction over the claims asserted in this civil action.

## Venue

     7.    Under 28 U.S.C. section 1391(b), the Western District of Texas is a proper venue for this action, because UPC is deemed under section 1391(d) to reside in this judicial district. UPC is a corporation subject to personal jurisdiction in Texas at the time this action is commenced. Texas has four federal judicial districts, and if the Western District of Texas were a separate state of the United States, Defendant's contacts in this district would be sufficient to subject it to personal jurisdiction here.

     8.    The Austin Division of the Western District of Texas is also a convenient venue for the parties and witnesses.  Numerous fact witnesses are long deceased, but the few who are alive

live in Austin, Texas.  Plaintiff lives in Austin.  Numerous evidentiary documents, very old, are archived in protected government, academic, and private collections in Austin, and will be examined and proven admissible in Austin.  UPC operates a software technology center in Austin, runs trains on its rail lines throughout Travis County, and is well equipped to litigate this case in this federal court.

### Misnomer, Alter-Ego

9.     In the event any parties are misnamed or not included herein, such event was a "misnomer," or such parties are or were "alter-egos" of parties named herein.

### Facts

**A.     The Southern Pacific Railroad Company**

10.     In 1852, about six years after the United States annexed Texas, the Fourth Legislature of this new state convened in Austin and chartered a private railroad corporation, naming it The Texas Western Railroad Company.  Its legislated mandate was to build a railroad from the eastern state line to El Paso, which when completed would make Texas an attractive pass-through and destination for commerce and travelers coming from around the nation.

11.     Four years passed and construction of the trans-Texas railroad still had not begun. So on August 16, 1856, the Sixth Texas Legislature, convening in Austin, renewed the railroad company's charter and changed its name to The Southern Pacific Railroad Company ("SPRC").[1] SPRC began construction right away and, within a year, had built 23 miles of track between Marshall, Texas and Swanson's Landing on Caddo Lake, to the northeast at the state line.

**B.     Richardson Reorganization**

---

[1] Not related to the well known Southern Pacific rail system that later originated in California.

12.     SPRC's rapid progress came at a cost, however, for its debts had mounted considerably.  In November 1858, SPRC stockholders met and agreed upon a recovery plan:  that all stockholders contribute 50¢ per share to the company, and that, effective April 12, 1859, new shares would be half the value of older shares.  Validity of shares issued after that date would be proven by the words "Reduced Stock" written in red ink on the front of the stock certificates.

13.     Despite the money raised, SPRC was still in major debt.  So, in April 1859, the stockholders met again and agreed to the company's takeover and reorganization by one of its creditors, R. V. Richardson, under the conditions that (a) the purchase money would be used to satisfy company debts, and (b) the stock of all who paid the 50¢ calls would be deemed stock in the reorganized company.

14.     An execution sale was held in September 1859, and, as prearranged, Richardson purchased the railroad.  The debts were settled, and the old-company shares on which the 50¢ calls had been paid were deemed shares in the reorganized company.  The SRPC president, Jeptha Fowlks, published a circular in the New Orleans newspaper, cautioning potential investors to buy only SPRC shares "issued since the 12th day of April, 1859, and written on the face of the certificate the words 'REDUCED STOCK' in red ink, over the signature of the secretary."

## C.     The 300 Shares in This Case

15.     Meanwhile on June 10, 1859 — after the stockholders preapproved the Richardson reorganization and before it took place — SPRC issued 300 shares of stock to a new shareholder, Mary Key.  SPRC assigned par value at $100 per share and documented the issuance on Stock Certificate No. 1656.  A true copy of the original SPRC Stock Certificate No. 1656, front and back, is attached as Exhibit 1.  Plaintiff possesses the original.

16.     Significantly, written in red ink on the front of Certificate No. 1656 are the words

"Reduced Stock," just as the company president had described in his circular.  This demonstrated that SPRC, after reorganization, recognized the legitimacy of Mary Key's 300 shares, and that they were marketable as current, bona fide, valuable stock in the company.

**D.     "The Louisville Resolution"**

17.     By 1861 SPRC had built 25 miles of road and earned a land grant of 256,000 acres from the State of Texas on which to continue building.  However, SPRC had become mired in debt again.  Perhaps this owed in part to the turbulent times.  In February 1861 Texas seceded from the Union and, on March 2, joined the Confederate States of America.

18.     On March 15, two weeks after Texas seceded, SPRC stockholders convened in Louisville, Kentucky.  They passed another resolution asking for money from all shareholders, in the form of a one-dollar loan for every five dollars of stock owned.  Upon passage, the owner of Certificate No. 1656 and its 300 represented shares presented before the company, paid the agreed loan amount, and received the company's written legend on the back of Certificate No. 1656 proving compliance with this "Louisville Resolution."

19.     Four weeks later in the dark early morning of April 12, 1861, a Confederate warship opened fire on Fort Sumter, in the middle of the Charleston Harbor, where Union soldiers were garrisoned.  The American Civil War had begun.

**E.     Fulkerson Takeover**

20.     In September 1861 an execution sale of SPRC's assets was held in Marshall, Texas to satisfy four small judgment debts.  The judgments totaled only $8,097 and yet remained unpaid even after money was raised for the company by the Louisville Resolution.  H. S. Fulkerson purchased the company's assets for merely $7,500.

21.     Fulkerson took over operations of SPRC and held it out as a "new company."  In

reality, he was running the old company, only with the railroad assets he had bought at the sheriff's sale.  No new SPRC company was chartered; and the Texas Legislature had not revoked or changed SPRC's charter.  Fulkerson and his group continued operating the SPRC railroad through the Texas corporation that the legislature had chartered in 1852 and renewed in 1856, in which Mary Key and the other shareholders still owned their stock.

**F.      After the War**

22.      Five years later in February 1866, the SPRC stockholders convened in New Orleans.  The Civil War had been over for two years, and the fragile nation was struggling to mend. These "Southern stockholders" voted to restore the shares of all SPRC stockholders who had complied with the Louisville Resolution passed in March 1861.  As read one resolution,

> *Resolved,* That the action of the Southern stockholders who purchased the road in September, 1864 (actually 1861),[2] in now proposing to restore to their former rights all *bona fide* stockholders who shall comply with the Louisville resolutions of March 1861, manifests the most just and liberal spirit, and is the surest guarantee of the good will and good faith that should always characterize the administration of such a truly national enterprise.[3]

23.      Thus, despite the Fulkerson takeover in September 1861, because the holder of Certificate No. 1656 had complied with the Louisville Resolution, the 300 certificated shares at issue in this case continued to be good, valuable stock in SPRC.

**G.      Hall Takeover**

24.      Two months after the New Orleans meeting, a group of creditors, including members of SPRC's own board of directors, purported to loan $150,000 to SPRC secured by

---

[2] The Fulkerson purchase occurred in September 1861, not 1864.  There was no purchase of the road in 1864 according to any other known records.  The reporter of this resolution misstated the year.

[3] J. D. B. DeBow, *Debow's Review: Agricultural, Commercial, Industrial Progress and Resources*, Southern Pacific Railroad Convention, Vol. 2, Iss. 2, p. 207 (Aug. 1866), reprinted in Making of America Journal Articles, Univ. of Mich., Humanities Text Initiative, http://name.umdl.umich.edu/acg1336.2-02.002.

mortgages on the railroad assets (which SPRC now owned again).  Two years later in 1868, this creditor group foreclosed on their mortgages and purchased SPRC's railroad bed, track, rolling stock, and franchise at three sheriff sales conducted in Shreveport, Louisiana and Marshall, Texas. The leader, R. B. Hall, formed a corporation in Louisiana and named it the "Southern Pacific Railroad Company."

25.     The Hall group did not, however, foreclose on and purchase the corporate charter of SPRC that the Texas Legislature had conferred.  Further, the Hall group did not operate the SPRC railroad through the new Louisiana corporation they formed after buying the assets.  Instead, they continued to operate the SPRC railroad by and through the Texas chartered corporation, which remained the property of its stockholders like Mary Key.  SPRC demonstrated this consistently, such as by raising capital as the Texas corporation through bonds (see Exhibit 2) and stock offerings (see Exhibit 3).

## H.     Merger and Consolidation into The Texas Pacific Railroad

26.     Perhaps the most significant proof that the Texas corporation survived and continued operating the SPRC railroad after the Hall foreclosures occurred in 1872 when SPRC, as the Texas corporation, was merged and consolidated into a new railroad company, the Texas Pacific Railroad Company ("TPRC").

27.     In the prior year, 1871, the United States Congress incorporated TPRC and chartered it to construct a rail line from Marshall, Texas all the way through California.  Months later, the Texas Legislature enacted a bill authorizing SPRC, the Texas corporation it had chartered, to consolidate with the new federally chartered railroad.  Three weeks later by further legislation, the State of Texas donated $3 million in state bonds to the Texas SPRC, which would go to TPRC if the two companies consolidated.

28.     On March 21, 1872, SPRC, the Texas corporation, was merged and consolidated with TPRC, for which the latter paid $3 million.  $700,000 of the amount paid fully the Hall creditor group and other debts, $250,000 satisfied a state school fund debt, and the remainder was invested into improvements and expansion of the SPRC railroad.  None of the $3 million was paid to redeem the 300 shares of SPRC stock represented by Certificate No. 1656.  Upon the merger and consolidation, the 300 shares converted into proportional shares of stock in TPRC.

29.     Two months after the merger, Congress changed the name of TPRC to The Texas & Pacific Railway Company ("T&PRC").

## I.     Recap

30.     The 300 shares of SPRC stock at issue in this case survived every sale, takeover, and reorganization that befell the company or its assets:  by Richardson in 1859, Fulkerson in 1861, and Hall in 1868.  Upon merger and consolidation of SPRC into the Texas Pacific, the 300 SPRC shares converted into proportional stock ownership of T&PRC.

31.     The Southern Pacific Railroad Company (formerly the Texas Western) was chartered by Special Act of the Texas Legislature.  Only the legislature could revoke or change the charter.  Neither the charter nor its stock ownership simply vanished upon any of the asset sales or purported "new company" reorganizations.  In each instance, the creditor group continued to operate the Texas corporation as chartered by the legislature, and all stock ownership of the Texas corporation remained intact, including the 300 shares in this case.

## J.     The Stevenson Litigation

### *SPRC v. Stevenson*

32.     Back in August 1860, while V. K. Stevenson was SPRC's president, he directed the company to give two mortgages, or deeds of trust, to himself and R. V. Richardson as trustees.

The mortgages purported to encumber SPRC's assets, including its railway, stations, depot buildings, engine houses, and six million acres of land.  A week later, Stevenson directed SPRC to issue 350 construction bonds for $25 million in financing, secured by the two mortgages to himself and Richardson as trustees.

33.    Eleven years later in 1871, SPRC, under new leadership, sued Stevenson to annul these bonds and mortgages.  SPRC won a default judgment, and the case went up to the Texas Supreme Court on Stevenson's application for writ of error.  Instead of naming SPRC as the defendant in error, Stevenson named T&PRC, which for this reason filed a motion to dismiss.

34.    The supreme court denied the motion in an unpublished decision (copy attached as Exhibit 4) that further establishes T&PRC merged and consolidated into itself the <u>Texas</u> SPRC corporation, and not R. B. Hall's Louisiana corporation:

> [W]e think the inference is fully warranted that, from the consolidation thus effected by the State of Texas there exists a consolidated Texas corporation known by the law of this State as the Texas and Pacific Railway Company, in which is vested all the rights, forms, and privileges to which [SPRC] was entitled previous to said consolidation, and that the corporate existence of [SPRC] has been merged in and is now represented by [T&PRC].  That the charter of [SPRC] is neither lossed, forfeited, annulled, or surrendered, but still exists in its full force and vigor, these rights, privileges, and franchises being exercised to the extent and in the manner agreed and stipulated by the terms of their consolidation by the corporate organization and name of [T&PRC].

The supreme court wrote that the merger of "the entire corporate existence" of SPRC into T&PRC is "<u>plainly inferrable by the acts of the legislature, under and by virtue of which this company</u> <u>exercises and enjoys the franchises and privileges conferred upon it by the State of Texas</u>, and is entitled to be known and recognized as a Texas corporation."  T&PRC offered no evidence to rebut the presumption of the complete merger of SPRC's corporate existence, as the Texas corporation, into T&PRC.

*Stevenson v. Texas & Pacific Railway*

35.     In April 1873, a year after the merger and consolidation of SPRC into T&PRC, Stevenson wrote a letter to T&PRC demanding possession of the consolidated railroad company on the basis of his and Richardson's two mortgages in 1860.  T&PRC refused Stevenson's demand, and so he sued T&PRC in the U.S. Circuit Court in Tyler, Texas.  The court tried the case and ruled that no authority existed for execution of the mortgages, or for issuance of the construction bonds that the mortgages purported to secure.  The decision was not published, so a copy is attached as Exhibit  5.

36.     Stevenson appealed to the United States Supreme Court, which affirmed the circuit court judgment, holding that H. S. Fulkerson took title to SPRC assets free and clear of the Stevenson parties' mortgages on the same assets.  SPRC succeeded to Fulkerson's title, and, therefore, T&PRC took superior title of SPRC's assets upon the merger and consolidation with SPRC.[4]

37.     The *Stevenson* opinion further established that the SPRC corporation that operated after the Hall foreclosures and then merged into TPRC was the Texas corporation, in which Mary Key owned 300 shares.  The Court wrote, "(SPRC) was a corporation of the State of Texas, and, being thereunto duly authorized, became consolidated with (TPRC) … in consideration of $3,000,000 paid to the former …."[5]

**K.     L. S. Thorne and Heirs**

38.     After the merger and consolidation, T&PRC grew rapidly.  In 1874, the company hired Lansing Stephen ("L. S.") Thorne as a brakeman on one of its trains.  Mr. Thorne rose

---

[4] *Stevenson v. Texas Ry. Co.,* 105 U.S. 703, 708 (1882).

[5] *Id.* at 704.

through the company ranks and in only a few years was promoted to the company-wide position of Superintendent of Transportation.  In 1893, T&PRC made Mr. Thorne its Vice President & General Manager.

39.     At some time by now, Mary Key or her son conveyed to L. S. Thorne Certificate No. 1656 and her 300 shares of stock in SPRC, which had merged into T&PRC.

40.     In 1895, Mr. Thorne married Mary Cunning.  Six years later, together they had a daughter and named her Julia.  Unfortunately, when Julia was only 16 years old, her father died.  His certificated 300 shares of SPRC stock — now T&PRC stock — passed to his wife Mary.

41.     Six years later, Julia married Elgar Laird, and together they had a son, Lansing Stephen Laird, whom they named after Julia's father, L. S. Thorne.

42.     In 1932, Julia's mother, Mary Thorne, conveyed the certificated 300 shares of SPRC (now T&PRC) stock to Lansing Stephen Laird.  In honor of his biological maternal grandfather, ten years later his last name was changed from Laird to Thorne.  Now, he was the second Lansing Stephen Thorne.

43.     Years later, Lansing Stephen Thorne married Elizabeth Oram and they had a daughter, naming her Elizabeth Thorne.  In 1976, Elizabeth, whose married name at the time was Crumby, had a son whom she named John Stephen Crumby.

44.     In 2005, Lansing Stephen Thorne, the biological grandson of the original L. S. Thorne, conveyed the certificated 300 shares of SPRC stock to his biological grandson, John Stephen Crumby.  To honor their rich family heritage, and particularly his grandfather and great-great grandfather, John Stephen Crumby had his name legally changed to John Stephen Thorne.

## L.     The 300 Shares Today

45.     Today, the certificated 300 shares of SPRC stock has grown into a valuable equity

interest in Union Pacific Corporation, a holding company formed in 1969 to own the Union Pacific Railroad Company ("UPRR") and other subsidiaries.

46.    T&PRC, the company whom L. S. Thorne helped run at the turn of the 20th century, and into which SPRC had merged and consolidated, was, in 1976, merged into the Missouri Pacific Railroad Company ("MPRC").   The T&PRC stock into which the 300 shares of SPRC had converted was now converted into proportional MPRC shares.

47.    In 1997, MPRC was merged into UPRR.   The MPRC stock into which the 300 shares of SPRC had converted upon merger was now converted into a proportional interest in UPC, which wholly owns UPRR.   Upon this MPRC-UPRR merger the owner of the stock represented by SPRC Certificate No. 1656, issued in 1859, is now owner of proportional equity stock in UPC.

48.    That UPC stockholder today is John Stephen Thorne.

## Causes of Action & Remedies

49.    All allegations herein are incorporated by reference.

### *Declaratory Relief*

50.    Plaintiff seeks a declaration of the Court, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., establishing:  (a) the number, class, and present dollar value of shares of stock that Plaintiff owns in UPC, by virtue of the 300 shares of stock in SPRC and its successors; (b) the cumulative dollar amounts of the dividends and interest earned on Plaintiff's shares, from the date of their issuance to the present, and owed in cash, to the extent those sums are not reinvested in and included in the valuation of his UPC shares; and (c) each fact allegation recited herein as true, to the extent necessary to a full and final adjudication.

*Accounting*

51.     Pleading further, and as necessary to make the declaratory judgment determination requested above, Plaintiff requests that the Court order Defendant to produce a detailed, itemized accounting showing, upon each transaction, stock split, point in time, and other relevant event, the company of ownership, number of shares, class of shares, and dollar value of shares, that Plaintiff owns in UPC, by virtue of the 300 shares of stock in SPRC and its successors, as existing at each relevant point in time from the date of issuance to the present.

*Injunction, Specific Performance*

52.     Pleading further, Plaintiff seeks a final and permanent injunction, or alternatively a specific-performance order, requiring UPC to register Plaintiff's shares of UPC stock in his name with the U.S. Securities and Exchange Commission, and with any exchange and other authorities as required, in the number, class, and value as determined and adjudicated in this action, and to pay Plaintiff in cash the amount of dividends and interest owed, to the extent owed in cash and not subsumed within his shares.

**Interest**

53.     Plaintiff seeks prejudgment interest and postjudgment interest in the maximum amounts allowed by law.

**Prayer**

54.     WHEREFORE, Plaintiff John Stephen Thorne respectfully pray that, upon appearance of Defendant Union Pacific Corporation and upon a thorough accounting and final trial, Plaintiff have judgment of this Honorable United States District Court for all relief, general and special, legal and equitable, that Justice may warrant, including the following:

    a.      a declaratory judgment establishing:  (1) the number, class, and present

dollar value of shares of stock that Plaintiff owns in UPC, by virtue of the 300 shares of stock in SPRC and its successors; and (2) the cumulative dollar amounts of the dividends and interest earned on Plaintiff's shares, from the date of their issuance to the present, and owed in cash, to the extent those sums are not reinvested in and included in the valuation of his UPC shares;

b.     an injunction or specific-performance order requiring UPC to register Plaintiff's shares of UPC stock in his name with the U.S. Securities and Exchange Commission, and with any exchange and other authorities as required, in the number, class, and value as determined and adjudicated in this action, and to pay Plaintiff in cash the amount of dividends and interest owed, to the extent owed in cash and not subsumed within his shares;

c.     an award of interest and costs as appropriate and allowed by law.

Respectfully submitted,

ATTORNEYS FOR JOHN STEPHEN THORNE

By:  */s/ Keith A. Pardue*
     **Keith A. Pardue**

Keith A. Pardue
State Bar No. 15458500
PARDUE & ASSOCIATES, PLLC
2802 Flintrock Trace, Suite 213
Austin Texas 78738
Tel.    (512) 266-8135
Fax    (512) 371-4145
Email  *keith@keithparduelaw.com*


R. Bruce Phillips
State Bar No. 15940730
THE PHILLIPS LAW FIRM PC
P. O. Box 592403
San Antonio, Texas 78259
Tel.    (210) 888-5518
Email  *bruce@winyourjury.com*